The sole issue before this court today is whether the district court erred in granting summary judgment to the appellees on plaintiff's claims under the FMRA on interference and retaliation theory. And we contend that there were disputes of material facts sufficient to reach the jury as to both the interference and the retaliation claims. Would the court like me to start with a particular claim? Judge Goldberg Well, why don't you start with the interference claim. Gilhuly Sure. The interference claim, Your Honor, we contended in the court below that we made out a pre-interfecient case for an interference claim. The district court reasoned that the plaintiff's claim, the appellant in the court below, the retaliation claim. We believe that was error. Judge Goldberg And is there any way, explain to us in what way your interference claim differs from your retaliation claim? Gilhuly Sure. This court has noted on several occasions that the two claims are very similar when they were often brought up. They're often played together. Judge Goldberg They are, but there is case law out there that indicates when there's a complete overlap, it's not appropriate to guilt the plaintiff with a lily, so to speak. If you've got a retaliation claim, make it. Don't dress it up as an interference claim if there's no difference. So is there a difference? Gilhuly There is, Your Honor. And with respect to interference, here my client was put on a PIP beginning on October 12, 2011. About a month later, he tells the company, I have prostate cancer. At that point, he told HR, he told the supervisor, the company knows he's going to take FMLA leave. That's the magic word. Even though he doesn't need to say it, take FMLA leave, he's going to take a leave. Judge Goldberg He tells them this while the PIP is in effect,  Gilhuly Correct, Your Honor. It's about a month after he received the PIP. We didn't dispute in the court below that he had performance deficiencies. Judge Goldberg The 90 days started around November? Gilhuly The 90 days started October 12, 2011, Your Honor. And after they found out that he was going to take leave about a month later, they start to kind of backtrack and say, well, we think we're going to amend the PIP now because you're going to take some kind of leave. It's only after they find out that he's going. Judge Goldberg Didn't he acknowledge, leaving aside for a second, whether that's not really a retaliation you're talking about, leaving that aside for a second, did not your client acknowledge that there was no termination date on this  Gilhuly He did acknowledge that, Your Honor. But I think the gaping problem for the appellees is that the supervisor himself, Gilhuly, who's also a named defendant in this case, acknowledged that the PIP had an end date in an email. We cited that in our appendix. He said the PIP is scheduled to end on January 10, 2012. Judge Goldberg And your client in December suggested, what, that it be completed by January 12? Gilhuly He wanted to complete it before he went out on medical leave. Judge Goldberg And he went out on the 18th? Gilhuly Right. It was about five or six days after the actual first initial 90-day PIP had ended. Judge Goldberg But in what way was the extension of the PIP? Because remember, it's a way to give a person a chance to get up their performance so that they meet the standards that are required of them. How is extending the PIP, which is, it almost seems as if it's there to help him, and you're suggesting it was actually there to hurt him. How so? Gilhuly Well, Your Honor, and I think this goes back to Judge Schwartz's question, if you look at the plain meaning of the word interference, Black's defines it as a wrongful act of a person preventing or disturbing the activities of another. And I realize the CFR that's relevant here, and that's 29 CFR 825-220B, it's not very well worded, and it provides some examples of what constitutes interference. What we're arguing here is that they manipulated the PIP when that was supposed to end. Judge Goldberg But on the interference claim, which is what we're talking about, you really made that against Gilhuly? Gilhuly We made it against both, Your Honor. It was an artfully pled that the district court didn't note in the footnote that we did argue in our summary judgment response that we were making the interference claim against both Continental and Gilhuly. Judge Goldberg Okay. Even if that's true, can you respond to the question that Judge Ambrose put to you, which is, how is that an interference? How is that a negative job action and not a benefit to your client? Judge Ambrose Well, Your Honor, there was no written indication in the latter part of 2011 saying that Mr. Ross was having any kind of performance deficiencies. In other words, there was no indication that was written down that said, you're not performing on the PIP, you're not meeting your expectations of the PIP. Now, there's a dispute as to whether Mr. Gilhuly had verbal conversations with Mr. Ross about that. I thought Mr. Ross actually wanted his employer taking account of his illness and recognizing that he wasn't going to be able to do all the things he might otherwise have done. Was I mistaken in my understanding of the record? Judge Goldberg No, he did, Your Honor, but what he never contended was, at least as far as I recall from the record, he never contended that he was going. Judge Ambrose He said in his deposition he didn't think 90 days was a hard deadline, and I thought he also said in his deposition that he recognized other actions could be taken after the PIP. I mean, it sounded like he understood this is an action plan that's to help me, so I'm still struggling with the question that Judge Ambrose put to you. In what form or fashion is the company recognizing that the man's seriously ill, he's got a medical problem, he's not going to be able to act on the action plan like he otherwise would, we extend it, how is that a bad thing for your client and not something that your client should have been happy about and maybe was happy about given his desire not to be put on the spot while he was ill? Judge Goldberg Okay, Your Honor. He wasn't having, as far as my client was concerned, he was meeting his goals under the PIP in the latter half of 2011. So as far as he expected, come January 10, 2012, he should have been off the PIP, he had completed his performance expectations, and then he could go on leave, have his cancer surgery, come back, and hopefully get back to work. That's not what happened here. And that's what we contend is interference with the FMLA. Well, interference, but having an interference claim, you have to be denied FMLA benefits. What benefit was your client denied? Well, Your Honor, we can see that he got all the FMLA benefits he should have got. He got his time off, he got his medical benefits. But what you're also entitled to under the FMLA is job restoration. You're entitled to come back on an equal footing from where you were before. Well, he came back with job restoration, and it wasn't until, what, July 19 of the following year before he was terminated. At some point, if a company perceives that an employee isn't performing, and if after the PIP period has expired, the employee is perceived by the company still not to be meeting expectations, doesn't the company then have a right to terminate that employee? Yes, Your Honor, but the question was in the court of law was whether there was a disputed material fact as to whether Mr. Ross was not performing. The only time there was ever any written feedback against Mr. Ross was at the end of July when they actually decided to terminate him, and he had asked repeatedly, please give me written feedback about how I'm doing on the PIP. Maybe I'm missing something, but it would seem that what you're really saying is retaliation. Because on interference, it's sort of like the company has interfered with me in a way that FMLA benefits that I was entitled to, I did not get. And in his deposition, as you said, he acknowledged he received all the FMLA benefits he was entitled to. It seems that when you talk about termination, what you're really talking about is a retaliation claim, are you not? Well, that's correct, Your Honor, and again, they overlap. And there was a case that I didn't cite in my brief, and I'd be happy to submit a Rule 28J letter. The District of New Jersey had ruled in Wright v. Shore Memorial Hospital, it's 2013, U.S. District, Lexis, 164264. It was a case that had come out after the district court had issued its summary judgment opinion. The District of New Jersey said that you can bring an interference claim under a discouragement theory, and there's a three-part claim of facial case that you need to reach for that. What was he discouraged? He went, he got everything, he came back. And even as you've described it here, it still sounds like retaliation, because you said they extended the PIP because he asked for FMLA. If he got all his benefits, but you think they did something adverse, isn't that the very definition of a retaliation claim? It is, Your Honor, but if he says, I'm going to take medical leave, and then they say, well, we're going to change your PIP because you need to take medical leave, I would argue that that's discouragement. It's implicit discouragement, it's not explicit discouragement. So what you're saying is that any precedent that says a complete overlap, because so far, and I'm happy to be corrected, so far I'm not seeing anything but a complete overlap between your retaliation claim and what you say is your interference claim. Is there any aspect of your interference claim which is not also a part of your retaliation claim? No, Your Honor. Okay. Well, I would suggest the retaliation claim, then. Sure. And, Your Honor, it seems to me that the court seems to think that the retaliation claim was the stronger claim. Mr. Rick Ross took his medical leave in January of 2012. He comes back in late March of 2012, and then the company says, we're going to extend the PIP on you. By 60 days, we're going to give you time to get back up to speed on the new sales program. That seems like it's almost like an accommodation. They're trying to work with him. Excuse me, Your Honor. It seems like it could be an accommodation. They're trying to work with him. People may still have problems, but they want to give him some additional time in order to allow him to meet the standards that they're looking for. Sure, Your Honor. But the problem is that when he gets this written memorandum from the company, and there's a 508A through 519A in our appendix. It's a memorandum from Joe Foley. He's basically disciplined for not coming up to date with the programs that happened and the customer meetings that happened a couple days before he went on leave and a couple days after he had come back from leave. In other words, it gave him really no time. It sounds like, just looking at the record, there were some customers who were real happy. Yes, and that's also a disputed material fact, Your Honor, because the customer who was unhappy had said he never really made a complaint. He had made a comment. Whereas Mr. Gololi had said the customer had made a complaint saying, I want Mr. Ross removed from my account. Yeah, but didn't Mr. Betts also say and confirm in his deposition that he said, I want Ross off my account? He doesn't know the business. He's not adding value. He's a detriment. I want him off the account. Now, whether you characterize that as a complaint or not, didn't the man say those things in his deposition? I think he did, Your Honor. Okay. And when you've got a job that's, in effect, serving the public, I mean, that's a pretty damning comment. It is, Your Honor. Well, can I ask you this about your retaliation claim? Would you agree that the case that your client has is at most circumstantial? It is, Your Honor. And that puts you into a McDonnell Douglas burden-shifting framework, right? Correct, Your Honor. And I think there was enough in the court below that a reasoned fact-finder could have set the count if it was pretext. What's your evidence of pretext? Numerous things, Your Honor. One being that there was no written negative feedback in the latter half of 2011 that he was doing anything wrong on the PIP. The only time he gets any kind of written feedback is way after the company finds out that he has cancer, months after. Isn't there evidence that there are meetings internally between Mr. Gilhooly and the HR department talking about the status of your client leading up to the formulation of the PIP, the formulation of the PIP itself, and then, according to the HR department, write-alongs and follow-ups and things like that indicating that they're following him closely for those 24 days before he calls and says, I've got prostate cancer? Yes, Your Honor. But what's a disputed fact is whether Mr. Gilhooly ever said, Mr. Walsh is not performing well during those days before he tells the company I have prostate cancer. So your position is that the lack of a statement by the supervisor outside of the PIP, in the establishment of the PIP, that that negative comment, the absence of any negative comment is itself evidence of pretext? It's not the sole evidence of pretext, Your Honor, but I would submit that it could be evidence of pretext. And I think if you presented it to a jury, they could say, this is a major company, this is Connell Appliers, everything is documented. And when there's no written comments about anything having to do with Mr. Walsh's performance that are negative, and then what happens, happens, I think you could determine that there's pretext. And the supplemental documents that we had filed with the court at a letter request by the clerk, the PIP sheet actually has spaces in it for Gilhooly's comments, and none of them are filled in. OK. Why don't we hear from Ms. Bail, and we can do that. Yes, Your Honor. Thank you. Thank you, Your Honor. If it would please the Court, my name is Madeline Bail, and I represent the Attali's Continental Tire of the Americas and Kevin Gilhooly in this matter. If I just may begin by addressing the statement that my opponent just made about the submission we recently sent to the court, that chart was a document that was created by the plaintiff, and no one from Continental created that document. That was something that he submitted along with his own self-critique that he gave to his supervisor, Kevin Gilhooly, on October 11th, knowing that the PIP was coming. Was he ever given a final evaluation, Mr. Ross, under the PIP addendum? After the PIP addendum was issued, Your Honor, Mr. Gilhooly prepared a memorandum on July 19th. Well, that's the day it was filed. I mean, before that. There was no written evaluation, per se, conducted, but nor was a written evaluation required under the Continental's policies. Usually, what you have, I guess you have now 90 days plus 60 days, so you have 150 days. And I thought every 30 days there was sort of a, let's get together and talk it over. Is that correct? That's correct, Your Honor. And what was said during those four 30-day intervals before you get to the last one? Both Mr. Gilhooly and the plaintiff testified that they had ongoing communications. There's emails from Mr. Gilhooly saying that he wanted to meet with Mr. Ross to review his progress during the first 90-day period. He sent, Mr. Ross sent emails to Mr. Gilhooly, bringing him up to date as to what he's been doing. There was ongoing communications. Mr. Ross testified in his deposition that Mr. Gilhooly was always available to him. If he needed assistance or he needed to have some things explained to him, he could reach out to him either by email or by phone call. They had occasional face-to-face meetings, but this was an on-the-road sales team. So Mr. Gilhooly was headquartered in Connecticut, and Mr. Ross was headquartered in Philadelphia, and they would get together and meet, and they'd have weekly or biweekly regional sales conference calls on the phone. But that was how they interacted. There wasn't a formal, you know, sit down and let's have a written evaluation. That was not required under the policy. That was not required under the PIP. Purpose of the PIP, as Your Honor mentioned, was a rehabilitative measure. And when Continental found out that Mr. Ross had this cancer diagnosis, they were trying to be compassionate and kind to him and not make him feel like he had to be, you know, put himself through groups to meet the requirements of his PIP. Did he want feedback? Did Mr. Ross ask for feedback before he went out on leave? He kept asking for written feedback. And for clarification. I'm sorry, Your Honor. And for clarification, too, did he not? I'm not sure I followed. I thought he was asking for clarification repeatedly of the PIP status. As the status of his PIP? After January 12th. He was asking for clarification regarding the status of his PIP. And he testified in his deposition that he knew while he was on leave that his PIP was pending. And when I asked him what was the status of your PIP when you came back from your leave, he said it was to be determined. Okay. I'm sorry. I got us off course. Why don't you go back to Judge Jordan's question? Yeah. And you were saying he did ask for feedback. He did want feedback. And so I guess my question is, why didn't he get any kind of review or update on how he was doing, even if there was a decision not to terminate the PIP on a 90-day schedule? Is there a negative inference to be drawn from the fact that he was left in the dark and it's only after the fact that he's told, no, you're not making it, the PIP is not working out? Your Honor, there is, in our brief recite, instances in November when Mr. Guguli met with the plaintiff, he also, before he went out on leave to review how his progress was, he was getting feedback. He was looking for something in writing, though. That was what his deal was. And Mr. Guguli didn't have the time to sit down and do that with him. He was talking to him on the phone. He was conversing with him by email. They were having customer meetings. And the same is true when he came back from his leave. Mr. Guguli spent almost an entire day trying to go over with him the meetings and the programs that he had missed while he was out. Are those actual questions that arise from there being no record here, only Mr. Guguli's assertion that I was telling him how he was doing, that was good enough, et cetera? I mean, the argument we're getting from the other side is, they sandbagged me and they did it because they wanted to get rid of me because FMLA would leave. You say, well, Mr. Guguli was giving him feedback. Is it for a jury to decide whether that's credible or not, that Mr. Guguli was giving him the feedback that would have been in writing anyway, or whether he was getting sandbagged the way Mr. Ross is implying or asserting? Well, Your Honor, as I said, there is no requirement that it be in writing. That is just something that Mr. Ross felt he should have. So there's no requirement in Continental's policies, nor is there anything in the PIP that said he would get reviewed formally in writing every 30 days. They had an ongoing conversation, and there's documentation in terms of email exchanges regarding Mr. Guguli meeting with Mr. Ross to review various things. Sure, there's no legal requirement and there's no policy requirement at the company. I guess what I'm trying to ask, perhaps inartfully, is does the lack of a written record open up the question of a factual dispute about how Mr. Ross, what he was being told and what he understood, and whether or not you actually did leave him thinking something different than what happened in real life after he took his FMLA leave? Your Honor, there is written documentation of the fact that there was communications back and forth. I guess that's kind of where I'm not understanding your question because we submitted Mr. Guguli's 12-page memorandum which outlines all the communications that they had from the beginning of the PIP in October through July 19th. All the communications and emails, and there was attached to that in part of the record, are the actual emails between Mr. Guguli and Mr. Ross and others at Continental regarding what Ross was doing and what he was supposed to be doing and what he was failing to do throughout that entire period. There isn't a formal document that says this is your 30-day write-up, but there was documentation back and forth and Mr. Ross admitted at his deposition that his supervisor was always available to him. And what's your response to Mr. Scipio's assertion that the lack of documentation one would expect to find at a company continental size is itself evidence of pretext? And I may not have put it quite the way he would have, but that's what I understood him to be arguing. I think, Your Honor, that the evidence in this case indicates that the problems that Mr. Ross was having before he announced his medical issue were the same problems he was having after he returned from his leave and continued on for months. Case law in this circuit requires that there be some kind of temporal proximity and we've cited in our brief a line of cases that indicate that if you've got performance issues beforehand and they're the same performance issues that you have when you come back, that there is no temporal proximity and you cannot establish a prima facie case. The lower court found that although Continental took Mr. Ross' FMLA leave into consideration that there was no evidence of any retaliatory motive on their part, all the testimony and all the evidence in the case and the written emails clearly indicate that they were trying to cut the guy a break. And they were trying to be fair to him and give him every accommodation that they could. But at the end of the day, the employer needed to get the job done and Mr. Ross was not a good fit for that position. At Mr. Ross' deposition, he was asked about the meetings he had with Gil Hooley? Yes. And what did he say was discussed? Are you asking me that question, Your Honor, with respect to any particular time frame? I mean, he talked about the meeting he had with Mr. Gil Hooley in September when Mr. Gil Hooley explained to him... When he... The opposing counsel said that Mr. Ross wanted feedback. He wanted written feedback. What did he say about the verbal feedback he got? He said that Mr. Gil Hooley was generally available to him and that he would consult with Mr. Gil Hooley at any time he needed assistance with anything. Did he ever... Did he indicate he had ever asked Gil Hooley about how he was doing with the PIP or get any report from Gil Hooley about how he was doing with the PIP? Were the meetings about the PIP? The meetings were about how he was doing. Okay. What his performance... How his performance was. And there is documentation before Mr. Ross went out that he met with Mr. Gil Hooley. Mr. Gil Hooley said he wanted to meet with Ross... It was in November, to review his performance and how he was doing with the PIP. That was right after Mr. Ross sent him an email giving him an update as to what he had been doing. So there is that documentation right there. And Mr. Ross, at his deposition, said generally that Mr. Gil Hooley was available to him. He talked about, at his deposition, how he wanted to know what the status of his PIP was. He wanted it terminated by the time he went out on leave. But he also admitted, at his deposition, that there was no end date and that it was pending while he was out and it was to be determined when he came back. So I hope that answers your question. No further questions. All right. Thank you. Thank you very much. Thank you. Mr. Sibiot? This goes back to what Judge Walford just commented on. At 356A of the appendix, Mr. Gil Hooley was asked why he didn't give written feedback. And his only response was, I didn't have to. The rules didn't require that I have to. Again, going back to Judge Jordan, this, I think, shows that there could be pretexts. A reasonable jury could say there's pretexts.  if there was a stack of papers saying, you're having problems, you're not doing well, you're not meeting the PIP requirements, then he says I'm going out on leave. But that's not what happened here. The evidence, though, is, and I don't take it it's rebutted, is that there was ample oral communication, even if there wasn't written communication, right? There was ample oral communication, but the substance of those communications is a material fact for trial for the jury to decide. What's the problem with Mr. Gil Hooley's answer, I didn't have to? I mean, if it's in fact the case that everybody's busy, there's not, you know, there's no requirement or even any reasonable expectation that I'm going to give you everything in writing, how does the absence of writing turn into pretext? Well, Your Honor, there are a number of reasons. One, everybody's email, you could send an email saying, hey, Mr. Walsh, you're doing good on your PIP. And my opponent has said, Mr. Gil Hooley doesn't have time to do that. Well, he had time to write a 12-page memorandum in July outlining every single last detail as to why he was being let go. He could have taken time to at least write a paragraph in an email. That could show pretext. I think a jury couldn't reasonably say that's pretextual. But there's no requirement that you have written? There's no requirement for the company policy that it be written. But again, a company the size of Continental, I think a jury might find it a little hard to believe that nothing's written down. Everything's written down in major companies nowadays. It's standard policy in most HR departments. It's just a matter of common sense. Didn't Walsh testify that he thought that the company never intended to release him from the PIP from the time it was implemented before he got sick? He did testify later on. I have no further questions. Thank you very much. Thank you both counsel. We'll take the matter under advisement. We'll call our last case.